EMMA B. HANFORD *et àl.*

*v.*

CHARLES B. PROUTY *et al.*

*Filed at Ottawa May 14, 1890.*

| 133 | 339 |
| 143 | 616 |
| --- | --- |
| 133 | 339 |
| 42a | 293 |
| 133 | 339 |
| 150 | 58 |
| 151 | 244 |
| 44a | 288 |
| 133 | 339 |
| 52a | 144 |
| 52a | 475 |
| 133 | 339 |
| 163 | 73 |
| 61a | 607 |
| 133 | 339 |
| 78a | 888 |
| 133 | 339 |
| 101a | 9556 |

1. TRUSTEE AND CESTUI QUE TRUST—*debtor and creditor—when the different relations exist.* A widow continued the business in which her husband had been engaged in his lifetime, using the property, in conducting the business, which was left by will to her and her children. It was *held*, that so long as the property of the children was employed in the business it was a trust fund in the hands of the mother. But upon a settlement between her and her children, in respect to their shares in the estate, she gave them her obligation for their respective portions, and they gave in return a release to her from any further liability to them. This was regarded as an extinguishment of the trust, at least so far as concerned any subsequent indebtedness, and thereafter the legal relation between the mother and the children was that of debtor and creditor.

2. PARTNERSHIP—*marshaling assets—as to debts of the firm, and debts of individual partners.* The equitable rule which requires the assets of a partnership to be first applied to the payment of firm debts, and *vice versa*, is founded, not upon the equities of the creditors, but upon the equities as between the partners. Each partner has the equitable right to have partnership assets applied, in the first instance, to the satisfaction of partnership debts, so that his individual property may be relieved; and so the members of the firm have each an equitable right to have the individual property of each partner first exhausted in satisfying his individual debts, in order to the exemption of the joint estate, as far as possible, from seizure for individual debts.

3. But firm creditors whose debts have not been reduced to judgment have no specific lien, either legal or equitable, upon the property of either the firm or of the individual partners, and their right to have the firm assets so marshaled as to satisfy their debts first, can only be worked out through the equities of the partners.

4. So a sale made in good faith by one partner to a co-partner, or to a third person, of all his interest in the firm, is as valid to transfer the interest of the seller to the vendee as a sale between individuals, although the buyer and seller are insolvent, and such sale may defeat their creditors; and as the firm creditors have no lien, the buyer can dispose of the property as his own, and pay his separate creditors, to the exclusion of joint creditors, and *vice versa*.

5. DEBTOR AND CREDITOR—*preference among creditors.* Trade creditors are not entitled to preference over other creditors. A debtor may legally apply his stock of goods to the payment of his obligation given for a debt due to another, to the exclusion of trade creditors, and the payee or holder of such obligation may take steps whereby to obtain a lien on the debtor's property.

6. So where one engages in mercantile business with funds belonging to another, there will be no equitable right, as between them, to have the stock of goods applied in the first instance to the payment of the trade creditors. Such creditors, having no judgment, are entitled to no preference.

7. INSOLVENT DEBTORS—*preference among creditors.* After a debtor has made up his mind to make an assignment of his property for the benefit of creditors, all conveyances, transfers, and other dispositions of his property or assets, made in view of his intended general assignment, whereby any preference is given, will, in a court of equity, be declared void.

8. To render a lien acquired by confession of judgment and the issue of execution before the making of a general assignment by a debtor, fraudulent, it must appear, first, that at the time the judgment was entered, execution issued and levy made, the debtor had made up his mind to make an assignment for the benefit of creditors; and second, that he had some agency in bringing about the entry of the judgment and the seizure of his property on execution. When the lien of the execution is apparently superior to the assignment, the burden will rest upon the party seeking to defeat such lien, to establish both of the foregoing propositions.

9. In this case, a debtor gave his judgment notes, to which were attached warrants of attorney for the confession of judgment at any time. Some months afterward, the payees of the notes learned from the debtor's business manager, in response to an inquiry, that the debtor was unable to pay all his debts, and they, without any consultation, and without his knowledge, had judgments confessed on the notes, and execution issued, and levied on the debtor's stock of goods. The debtor on the next day consulted with the same attorneys who procured the judgments, execution and levy, and by their advice made a general assignment for the benefit of creditors. The proofs showed that the steps taken by the payees of the notes were of their own motion, uninfluenced and unaided by the debtor or his business manager, and that there was no collusion or co-operation between them: *Held,* that the executions and levies did not constitute an illegal preference.

10. CONSIDERATION—*sufficiency—settlement and release of a demand.* The transfer of trust property to a trustee of the trust estate, by the *cestui que trust,* and the release and discharge of the trustee from all

liability for the use of the trust property for several years, is a sufficient consideration for the making of notes by the trustee to the *cestuis que trust.*

11. PARENT AND CHILD—*duty of the former—as to the support and education of his children.* As a general rule, a father must, if he can, maintain as well as educate his infant children, whatever their circumstances may be, and no allowance will be made to him out of their property while his own means are adequate for such purpose.

12. So if the mother, after her husband's death, voluntarily takes it upon herself to maintain and educate her children, she can not be compelled, even in the interest of creditors, to charge her children with the expense of that which she has thus elected to do for them gratuitously.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. OLIVER H. HORTON, Judge, presiding.

Mr. MATTHEW P. BRADY, for the appellants:

Mrs. Burgess, in carrying on the business, was a trustee for appellants to the extent of their interests, and accountable to them for their share of the profits of the business, and having failed to pay them their share, was, at the date of the settlement, justly indebted to them for their shares.

Where a trustee or guardian employs trust funds in a trade or venture of his own, whether he keeps them separate or mixes them with his own private moneys, the *cestui que trust* is entitled to his proportion of the profits made. *Bond v. Lockwood,* 33 Ill. 212.

An executor carrying on the testator's business is chargeable with such balances of profits as from time to time may be in his hands. *Palmer v. Mitchell,* 2 M. & K. 672; *Robinett's Appeal,* 26 Pa. St. 174.

The beneficiary is entitled to claim all advantages actually gained, and to hold the trustee chargeable for all losses in any way happening from a violation of this duty. 2 Pomeroy's Eq. Jur. 1075.

All persons who stand in a fiduciary relation to others, must account for all the profits made upon moneys in their hands by reason of such relation. 1 Perry on Trusts, sec. 430; *Thorp* v. *McCullum*, 1 Gilm. 615.

Agents, guardians, and all other persons clothed with a fiduciary character, are subject to this relation. 1 Perry on Trusts, sec. 430.

The better opinion appears to be, that where a sole representative is at the same time guardian, the law will adjudge his ward's proportion of the estate to be in his hands, as guardian, after the full expiration of the time fixed for the settlement of the estate. Schouler on Exrs. and Admrs. 247, and cases in note 2.

A guardian will not be permitted to reap any personal benefit from the management of the ward's estate. He is regarded as a trustee of his ward, and the general principles of the law applicable to a trustee would be applicable to him, and he will be required to account for all the profits and income received by him in the course of his management of the trust. 1 Parsons on Contracts, 116; *Tenney* v. *Evans*, 14 N. H. 343; 40 Am. Dec. 132; *Moore* v. *Moore*, 5 N. Y. 256; *Gardner* v. *Ogden*, 22 id. 343; *Hanna* v. *Spotts*, 5 B. Mon. 132; 43 Am. Dec. 132.

It is, of course, wholly immaterial whether Mrs. Burgess be considered guardian or executrix,—in either case she is a trustee.

The evidence fails to show that the entry of the judgments and the making of the assignment were "part and parcel" of the same transaction. When the judgments were entered and executions sued out, Mrs. Burgess had no intention to make an assignment. *Field* v. *Geohegan*, 125 Ill. 68.

Messrs. WEIGLEY, BULKLEY & GRAY, and Messrs. BAYLEY & WALDO, for the appellees:

Partnership property is a fund or estate held for the purpose of the partnership, as a separate and distinct entity.

The interest of a partner therein is only a claim against the floating balance or surplus which may remain after the payment of the firm debts. *Rosenstiel* v. *Gray,* 112 Ill. 288.

The distinguishing characteristic of a partnership is the sharing in profits and losses. *Wilcox* v. *Dodge,* 12 Bradw. 517.

When a partner buys out his co-partners, agreeing to pay the debts of the firm, the partnership property remains, for firm debts, just as before the sale. The lien of the firm creditors attaching must be preferred to the lien of an individual creditor of the remaining partner attaching first. *Conroy* v. *Woods,* 13 Cal. 626; *Phelps* v. *McNeeley,* 66 Mo. 554; *Calender* v. *Robinson,* 96 Pa. St. 454.

An indebtedness created for the benefit of a trust estate is a charge on the same, and may be collected thereupon. *Dyett* v. *Coal Co.* 7 Paige, 9; 20 Wend. 571; *Moore* v. *Lambkent,* 63 Ga. 748; *Wylly* v. *Collins,* 9 id. 223.

Debts contracted by a trustee upon the faith of the trust estate are a charge upon such estate. *Insurance Co.* v. *Bays,* 4 Barb. 407; *Montgomery* v. *Everleigh,* 1 McCord, 154; *Frazer* v. *Brownlow,* 3 Ired. Eq. 237; *Carter* v. *Everleigh,* 4 Dessaus. 19; *James* v. *Mayrant,* id. 589; *Ex parte Richardson,* 3 Mad. 157.

Beneficiaries can take nothing until all trade debts are paid in full. *Ex parte Garland,* 10 Ves. Jr. 110; *Thompson* v. *Andrews,* 1 M. & K. 116; *Ferry* v. *Laible,* 31 N. J. Eq. 576.

A mother is not under any legal obligation to support her child so long as the father is living, or the child has an estate of its own, or is able to support itself. *Mowbry* v. *Mowbry,* 64 Ill. 383; *Pray* v. *Gorham,* 31 Me. 240; *Commonwealth* v. *Murray,* 4 Binn. 487; 1 Blackstone's Com. 453; *Railway Co.* v. *Stuttler,* 54 Pa. St. 375; 1 Parsons on Contracts, *308.

A father died intestate, leaving an estate to his widow and his two minor children. It was *held,* that the mother will be allowed, out of the portion of the estate belonging to the children, for their maintenance; and this for time past as well as

time to come. *Wilkes* v. *Rogers,* 6 Johns. 566; *Hayward* v. *Cuthbert,* 4 Dessaus. 445; *Osborn* v. *Van Horn,* 2 Fla. 260.

Courts will even make appropriations out of the child's estate, in some instances, where the father is living and has means with which to support the child, (see *Jervoise* v. *Silk,* Cooper's Ch. 52,) and always when he has not the means. *Newport* v. *Cook,* 2 Ashm. 332; *Ex parte Green,* 1 Jac. & W. 253; *Carter* v. *Rolland,* 11 Humph. 339.

When the same person is both executor and guardian, he can not be held liable as guardian until his accounts as executor show a transfer to his account as guardian. *Conkey* v. *Dickinson,* 13 Metc. 51; *Burton* v. *Tunnell,* 4 How. 424.

He can not be held liable in both capacities. *Wrenn* v. *Grayden,* 1 How. (Miss.) 365; *Porteux* v. *LePage,* 6 Iowa, 123.

An executor who is also guardian should first settle his account as executor, and then transfer the balance to the guardianship account. *Conkey* v. *Dickinson,* 13 Metc. 51; Schouler on Domestic Relations, 373.

Mrs. Burgess never having filed her bond, or obtained her commission as guardian from the probate court, according to the statute, never became, in fact, the guardian of her children, but held the property, from and after her husband's death and until the date of the failure, as executrix. Rev. Stat. chap. 64, secs. 5, 8, 9; *Wadsworth* v. *Connell,* 104 Ill. 369.

If any creditor of an insolvent debtor contemplating an assignment, obtains a preference by or through the connivance or assistance of such debtor, the preference will be void, as being within the voluntary assignment law prohibiting preferences. *Preston* v. *Spaulding,* 120 Ill. 208.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

On the 27th day of April, 1870, Charles A. Eaton died, leaving a last will and testament, and leaving him surviving his widow, Emma E. Eaton, and two children, Emma B. Eaton,

then thirteen years of age, and Harry Eaton, then of the age
of six years. Charles A. Eaton, at the time of his death,
was a partner in the firm of Eaton & Abbey, dealers in guns,
fishing tackle, etc., his interest in the assets of the firm, as
estimated in the inventory filed by his executrix, being worth
$16,969.10. By his last will he bequeathed one-third of all
his property to his widow, and one-third to each of his chil-
dren, and appointed his widow as his executrix. By a codicil
to his will he provided that his executrix might continue said
business, either in her own name or as copartner with others,
and might sell or dispose of any or all of his property, at
public or private sale, as she might deem most for the interest
of herself and children. Said will and codicil were duly ad-
mitted to probate by the County Court of Cook county, and
on the 6th day of May, 1870, letters testamentary were issued
to said executrix.

The business of said firm was continued by Mrs. Eaton and
the surviving partner until August 7, 1870, at which date
Mrs. Eaton purchased the interest of the surviving partner
for $8000, paying therefor $7000 of her own money which she
had realized from certain policies of insurance on the life of
her husband, and giving her individual promissory note for
$1000, due in thirty days. After such purchase Mrs. Eaton
carried on said business under the name and style of "E. E.
Eaton," and continued to carry it on under that name and
style for nearly sixteen years, that is to say, until June 22,
1886. The stock of goods and all other tangible property
employed in said business were totally destroyed by the Great
Chicago Fire of October 9, 1871, but Mrs. Eaton, having real-
ized $17,000 from the insurance of the property destroyed,
and having collected $6000 from book accounts, resumed busi-
ness, and afterward paid off all her then existing liabilities,
which amounted to nearly or quite as much as her then exist-
ing capital.

In the year 1871, Mrs. Eaton married Alonzo Burgess, who became her business manager, and continued to act in that capacity until June, 1885, when he was partially superseded by Charles B. Prouty, and on the 1st day of December, 1885, he was entirely superseded by Prouty. Burgess, during the time he managed the business, drew out a salary at the rate of about $1200 per year, and it also appears that Mrs. Eaton, now Mrs. Burgess, drew out of said business, during the time she carried it on, at the rate of nearly $4000 per year, making in all a little over $60,000.

Both of Mrs. Burgess' children lived with their mother and step-father as members of the family, and were supported and educated by Mrs. Burgess and at her own expense, until the date of her settlement with them as hereinafter stated. No account was kept by Mrs. Burgess with either of said children, and no payment was ever made to either of them on account of their interest in the estate of their father, or on account of the profits realized from said business, and no charge was ever made by her against either of them for their maintenance or education. The evidence renders it probable, however, that a large portion of the moneys annually withdrawn by Mrs. Burgess from her business was used for family expenses, including the expense of educating and maintaining her children.

In April, 1885, Emma B. Eaton was about to be married to Frederick C. Hanford, and then, at the instance of her intended husband, she for the first time asked her mother for a settlement, as executrix and trustee, of her interest in the estate of her father, and also notified her brother that she had applied for such settlement. Negotiations ensued which, on the 16th day of April, 1885, resulted in a settlement between Mrs. Burgess and her children upon the following terms: She agreed to pay each of them the sum of $6000 in satisfaction and discharge of her liability to them on account of the estate of their father, and for a transfer and assignment by them to her of all their right, title and interest in said estate. Mrs. Burgess

thereupon executed and delivered to her daughter her promis-
sory note for $6000, dated April 16, 1885, payable three years
after date, with interest at the rate of six per cent per annum,
and also executed a warrant of attorney authorizing the entry
of judgment upon said note by confession at any time after
its date.   In consideration of said note and warrant of attor-
ney, said Emma B. Eaton, at the same date, executed, under
her hand and seal, an instrument, by which she released and
forever discharged Mrs. Burgess, as executor and guardian,
under and by virtue of the last will of Charles A. Eaton, de-
ceased, and the codicil thereto, of and from all actions, causes
of action, controversies, claims and demands whatsoever, for,
on account or by reason of all the rights, interests or claims
of the releasor, of any kind or character, respecting or touching
the personal property, assets or estate, of or belonging to her
under and by virtue of said last will and codicil.  At the same
time and for the same consideration, she executed under her
hand and seal and delivered to Mrs. Burgess, another instru-
ment, in and by which she sold, assigned and transferred to
Mrs. Burgess all her right, title and interest in and to the
assets, personal effects and business of the store and business
then and theretofore carried on under the name and style of
E. E. Eaton, and in and to all the personal property of every
name and description of or belonging to the assignor, under
and by virtue of the last will and codicil of her father, Charles
A. Eaton, deceased, and all her right, title and interest to be
derived in any form from said estate, or under and by virtue
of said last will and codicil, excepting only her undivided in-
terest of one-third in and to the real estate of or belonging to
the estate of her said father, and devised to her by said last
will and codicil.

At the time said settlement was made, Harry Eaton was
not of age, and the consummation of the settlement as to him
was therefore postponed until after his twenty-first birth day,
and accordingly, on the 11th day of December, 1885, he hav-

ing. then attained his majority, his mother executed to him her judgment note for $6000 and he executed to her a release and assignment substantially identical with those previously executed by his sister.

Both of said judgment notes, at the time they were executed, were placed by the payees in the hands of Charles B. Prouty for safe keeping, and they were deposited by him in his private box in the vault of the Fidelity Safety Deposit Company, where he kept his private papers. Prouty seems to have been an old friend of Mrs. Burgess and her children, having been connected with Mr. Eaton's business from boyhood. He had then been recently given the position of manager of Mrs. Burgess' business, but the place where said notes were kept had no connection with the store or business, and they were kept there for the accommodation of the payees, and because it was considered a safe place of deposit.

It appears that Frederick C. Hanford, who had in the meantime married Emma B. Eaton, acting on behalf of his wife, made inquiries of Prouty from time to time as to the condition of Mrs. Burgess' business, and that on the 21st day of June, 1886, in response to an inquiry of that character, Prouty exhibited to him a statement taken from the books of the concern by the bookkeeper, which, in the opinion of Hanford made an unsatisfactory showing. Hanford, the following night, in consequence of the information derived from said statement, advised his wife to consult Grant & Brady, the attorneys who were employed by the parties on the occasion of the settlement between Mrs. Burgess and her children and who seem to have been the regular legal advisers of Mrs. Burgess and her family, and do as they might advise. On the following morning both Mrs. Hanford and Harry Eaton requested Prouty to place their notes in the hands of Grant & Brady, which he did in the early part of that day. Harry Eaton, at the time he made such request, does not seem to have been aware of the purpose for which his note was to be placed in Grant & Brady's hands,

but he explained to Prouty that he wished to do whatever his sister did. On the same day Mrs. Hanford and Harry Eaton went to the office of Grant & Brady, and as the result of the consultation there had, judgments were entered up on said notes that afternoon, and executions thereon placed in the hands of the sheriff, who, the same day, levied said executions on the stock of goods in Mrs. Burgess' store. On the forenoon of the next day, June 23, Mrs. Burgess executed to said Prouty, as assignee, a general assignment of her property for the benefit of her creditors, said assignment also having been drawn up by Grant & Brady, and having been executed under their advice. The assignment, on the day it was executed, was duly filed in the County Court of Cook county. On the 14th day of July, 1886, the sheriff delivered possession of the property held by him under his levy to the assignee, all the parties in interest agreeing that such surrender of possession might be made without prejudice to the rights and liens of the execution creditors.

On the 21st day of November, 1886, a large number of the other creditors of Mrs. Burgess, who with the assignee are the appellees in this court, filed their petition in the County Court, praying that said executions and the levies thereunder be decreed to be a fraud upon the rights of the petitioners, and be set aside, and that the claims of the judgment creditors be postponed until all the trade debts of Mrs. Burgess should be paid. Said petitions presented and were based upon the three following propositions :

1. That the property employed in said business under the name and style of E. E. Eaton, being trust property, in part at least, the rights of trade creditors to be paid out of the proceeds of said property so employed in said business, are superior to the rights of the beneficiaries of said trust.

2. That the promissory notes given by the insolvent, Emma E. Burgess, to Emma B. Hanford and Harry Eaton were without consideration, and, therefore, void as to creditors.

3. That the entering up of said judgments by confession, the levying of said executions on said property and the making of the voluntary assignment by the said insolvent were all part and parcel of one transaction, by which she divested herself and intended to divest herself of all dominion over her property.

The County Court decided the second and third of these propositions in favor of the petitioners, and rendered a decree precluding said judgment creditors from sharing in the proceeds of the insolvent estate until all the trade debts were paid. Said petition was taken by appeal to the Circuit Court, and that court, after hearing the case on pleadings and proofs, overruled all of said propositions, and held that said judgments and executions were valid liens, and entitled to payment in full, and rendered a decree accordingly. The Appellate Court, on appeal from said decree, concurred with the Circuit Court in its decision overruling the first and second of the propositions above mentioned, but held that said judgments and executions were a part of the voluntary assignment by Mrs. Burgess for the benefit of her creditors, and as such, constituted an illegal preference within the meaning of the thirteenth section of the statute in relation to voluntary assignments for the benefit of creditors, and were therefore void, but that said judgment creditors were entitled to be paid *pro rata* with the other creditors of the insolvent. A judgment was thereupon entered reversing the decree of the Circuit Court, and remanding the cause to that court with directions to enter a decree providing for the payment of the claims of said judgment creditors *pro rata*, not including the costs incurred by the entry of their said judgments. From the judgment of the Appellate Court, Mrs. Hanford and Harry Eaton, the judgment creditors, have appealed to this court.

We are clearly of the opinion that the first of the three propositions urged by the appellees can not be sustained. Even if it were correct in law as applied to the indebtedness existing at the time of Mrs. Burgess' settlement with her

children, it can have no application to such indebtedness as accrued subsequent to that date. The funds employed in her business which represented her children's shares in their father's estate were doubtless trust funds, but upon her settlement with her children the trust was extinguished. Their equitable interest was transferred to her, and their relation with her was no longer that of trustee and *cestuis que trustent* but merely that of debtor and creditors. No reason can be seen why, at least as to all subsequent indebtedness, they were not placed upon the same footing as other creditors, with complete liberty to engage with them in the race of diligence in endeavoring to collect their debts. While the record does not furnish the data from which it can readily be seen precisely how much and what portion of the indebtedness due the appellees accrued subsequent to such settlement, yet it is reasonably certain that much if not most of it was for goods sold to Mrs. Burgess by the appellees after that date.

But laying aside all question as to the time when Mrs. Burgess' indebtedness to the appellees accrued, we know of no rule, legal or equitable, which prefers their claims to those of Mrs. Hanford and Harry Eaton represented by said judgment notes. Appellees seek to apply to the interests of Mrs. Hanford and Harry Eaton in the funds employed by Mrs. Burgess in her business the equitable rule which, in case of partnerships, requires the satisfaction of partnership debts out of partnership assets, in preference to the debts of an individual partner. Without pausing to consider whether that rule applies as against a beneficiary whose trust funds have been, with his consent, employed in trade by the trustee, (a proposition which may well be doubted), we are of the opinion that no such consequences could flow from its application as are here contended for.

The equitable rule which requires the assets of the firm to be first applied to the payment of firm debts, and the individual assets to the payment of individual debts of the part-

ners, is founded, not upon the equities of the creditors but upon the equities of the partners. Each member of the firm has an equitable right to have partnership assets applied in the first instance to the satisfaction of partnership debts so that his individual property may, so far as possible, be relieved from the burden of firm indebtedness. So the members of the firm have each an equitable right to have the individual property of each partner first exhausted in satisfying his individual debts, so as to exempt the joint estate so far as possible from seizure for individual debts. But firm creditors whose debts have not been reduced to judgment have no specific lien, either legal or equitable, upon the property of either the firm or of the individual partners, and their right to have the firm assets so marshaled as to satisfy their debts first, can only be worked out through the equities of the partners. *Ex parte Ruffin*, 6 Ves. 119; *Ex parte Williams*, 11 id. 3; *Huiskamp* v. *Moline Wagon Co.* 121 U. S. 311; *Fitzpatrick* v. *Flanagan*, 106 id. 648; *Case* v. *Beauregard*, 99 id. 119.; *Waterman* v. *Hunt*, 2 R. I. 298; *Shackelford's Admr.* v. *Shackelford*, 32 Gratt. 481; *Coakley* v. *Weil*, 47 Md. 277; *Upson* v. *Arnold*, 19 Ga. 190; 1 Bates on Partnership, sec. 559, and authorities cited in note.

It follows that a sale, made in good faith, by one partner to his copartner, or to a third person, of all his interest in the firm, is as valid to transfer the entire property to the vendee, as is a sale between any individuals, although the buyer and seller are insolvent and thus defeat their creditors; and as the firm creditors have no lien, the buyer can dispose of the property as his own and pay his separate creditors, to the exclusion of joint creditors, or *vice versa.* 1 Bates on Partnership, sec. 560, and authorities cited. This rule has been repeatedly asserted by this court. *Ladd* v. *Griswold*, 4 Gilm. 25; *Hapgood* v. *Cornwell*, 48 Ill. 64; *Goembel* v. *Arnett*, 100 id. 34.

There being then no equitable right, as between Mrs. Burgess and her children, to have the stock of goods applied in

the first instance to the payment of her trade creditors, and such creditors having no judgments and therefore no specific liens on said goods, they are clearly entitled to no preference. Mrs. Burgess might legally have applied said stock of goods to the payment of the notes given to her children, even to the exclusion of her other creditors, and upon the same principle, her children were at liberty to obtain their judgments and executions, and levy on said goods, and if in pursuit of their legal remedy they have acquired a priority over Mrs. Burgess' trade creditors, there is no equitable principle which forbids their retaining such priority.

As to the second point raised by the appellees, we are unable to see any ground for the contention that said notes were given by Mrs. Burgess to her children without consideration. There is no possible doubt that as between her and them, she was liable to account as trustee. The original value of their shares in their father's firm property was perhaps a little less than $6000, but those shares had been employed by Mrs. Burgess in her business for fifteen years, and her business had been sufficiently profitable to enable her to withdraw from it nearly $4000 per year during all that period, the total amount thus withdrawn being about $60,000. No account had been rendered by her to the County Court, either as executrix, guardian or trustee, nor had she in any way accounted to her children either for the value of their shares in their father's estate, or for the profits arising from the use of those shares in her business. The plainest rules of equity charged her with the duty of accounting for the funds thus held by her in trust, as well as for the profits realized from their use.

So far as we can see, there is nothing in the record warranting the conclusion that the amounts she agreed to pay them was, as between them, too large. True, the amounts fixed upon do not seem to have been arrived at from any accurate statement of the account, but were adopted merely as an estimate of the fair cash value of their interest in the busi-

23—133 ILL.

ness, or rather of the probable amounts of their mother's lia-
bility to them as their trustee, but it is impossible to say that
the sums agreed upon were in any degree exorbitant. Indeed,
their equitable share of the moneys withdrawn from the busi-
ness by Mrs. Burgess as profits was, as it would seem, much
larger than the amount of the two notes. Their interest in
the funds employed in the business was a little less than one-
half, Mrs. Burgess, after the purchase by her of the share of
the surviving partner, owning the residue, still, of the $60,000
withdrawn from the business by her, they are to receive only
$12,000 or merely one-fifth.

But it is urged that, as they received from her their main-
tenance and education during their minority, they should be
charged with the moneys thus expended in their behalf. We
can not say, from anything appearing in the record, that, even
after charging them with the expense of their maintenance
and education, there would not still remain due them sums
equal to the amount of said notes, but their mother chose, as
she had an undoubted right to do, and as perhaps was her
legal duty, to maintain them at her own expense, without charg-
ing the cost of doing so to their separate estates, and there is
no rule which would now permit, and certainly none which
would require her, to charge them with such expenditures, in
rendering an account of her trusteeship. The general rule is,
that a father must, if he can, maintain as well as educate his
infant children, whatever their circumstances may be, and no
allowance will be made to him out of their property while his
own means are adequate for such purposes. Schouller on
Domestic Relations, sec. 238. Whether, in case of the death
of the father, such duty devolves upon the mother, need not
be decided, since it is clearly *proper* for her, if she sees fit to
do so, to voluntarily take it upon herself, and having done so,
she can not be compelled, even in the interest of creditors, to
charge her children with the expense of that which she has
thus elected to do for them gratuitously.

The consideration of said notes was, a transfer to Mrs. Burgess of the shares of her children in the personal estate of their father, and a release and discharge of her liability to them as their trustee. This was a valuable, and, as it would seem, a fully adequate consideration. The rights of said children, as creditors of their mother, can not therefore be postponed to other creditors on the ground of want or inadequacy of consideration.

It remains to be seen whether the judgments entered on said notes, the executions and levies, constitute, in contemplation of law, a part of Mrs. Burgess' voluntary assignment, so as to bring them within the prohibition of the thirteenth section of the statute in relation to voluntary assignments for the benefit of creditors. Ever since the decision of this court in *Preston* v. *Spaulding*, 120 Ill. 208, the rule has been settled in this State, that after a debtor has made up his mind to make an assignment of his property for the benefit of creditors, all conveyances, transfers and other dispositions of his property or assets, made in view of his intended general assignment, whereby any preference is given, will, in a court of equity, be declared void, and set aside, the same as though incorporated in the deed of assignment itself.

That the judgment notes upon which the judgments in question were entered were given months before any assignment was contemplated is unquestionable. The judgments were entered on said notes and the levies were made the day before the assignment was executed, so as to create liens in favor of the judgment creditors which were, apparently, disconnected with and anterior to the assignment. To bring the lien thus acquired within the rule laid down in *Preston* v. *Spaulding*, it must appear, first, that at the time said judgments were entered, executions issued and levies made, Mrs. Burgess had made up her mind to make an assignment for the benefit of her creditors, and, second, that she had some agency in bringing about the entry of said judgments and the seizure of her

property on execution. The lien of the executions being apparently disconnected with and superior to the assignment, the burden is upon the appellees to establish both of the foregoing propositions, and if they have failed to prove either, the decision must be against them.

The evidence shows that Prouty, Mrs. Burgess' business manager, first became satisfied of her insolvency on the 21st day of June, 1886. His bookkeeper had then drawn off and furnished him a statement of the condition of the business which showed that she was owing more than she could pay.

Mr. Hanford, in view of his wife's interest in the continued solvency of her mother, had previously made of Prouty frequent inquiries as to the condition of the business, and on the day last named, in response to a further inquiry of the same character, Prouty showed him said statement, and Hanford immediately pronounced the showing thereby made an unfavorable one. There can be no doubt that Hanford at that instant made up his mind to have immediate steps taken for the collection of his wife's note. He accordingly, at what was probably his first opportunity, communicated to his wife the information derived from the statement shown him by Prouty, and advised her to take her note at once to her attorneys and act according to their advice. The next morning she requested Prouty, who had her note in his possession for safe keeping, to deliver it to said attorneys, and she at the same time advised her brother to have his note placed in their hands. Prouty, thereupon, took both notes from his box in the vault of the Safety Deposit Company and delivered them to said attorneys. On the same day—June 22, 1886—Mrs. Hanford and her brother went to the office of said attorneys and had the judgments entered up. It is probable that Prouty, at the time he carried the notes to the attorneys, was aware of the intention of Mrs. Hanford and her brother to have judgments entered thereon, and it is shown that he was present, at least a part of the time, while the necessary papers for the entry of judg-

ment were being drawn up. It does not appear, however, that he advised or assisted in any way in the entry of the judgments, his testimony, which is not contradicted by that of any other witness, being, that the substance of all he said at the time was: "You will have to do as you think best about it."

There is no satisfactory evidence that Mrs. Burgess had, personally, any knowledge that entry of said judgments was contemplated until after the executions were in the hands of the sheriff. It is plain, therefore, that there was no personal co-operation on her part in the scheme of giving her children a preferential lien on her property. Nor is there any evidence of any determination on her part to make an assignment of her property for the benefit of her creditors until after the levies had been made. No conference between Mrs. Burgess and her business managers, or between them or either of them and their attorneys, as to what steps should be taken by her in the emergency which had arisen, is shown to have taken place until after the judgments were entered. On that day, but after the judgments were entered, Prouty called on Mrs. Burgess and told her what had happened, and they then talked the situation over, and the next morning they went together to the attorneys and obtained their advice as to what, under the circumstances, Mrs. Burgess should do. It was then determined that an assignment should be made, and an assignment was accordingly drawn up and executed. But the evidence wholly fails to show that at any time prior to that morning Mrs. Burgess had concluded to make an assignment, or otherwise to surrender her property in trust for the benefit of her creditors.

Of course the levy of the executions made it impossible for her to carry on her business any longer, and therefore, after the levies were made, nothing remained for her to do, if she wished in any way to protect the interests of her other creditors, but to make a general assignment. The fair conclusion from all the evidence is, that the levy of the executions precip-

itated the condition of things which rendered the assignment necessary, and bore to the assignment the relation of cause or antecedent, instead of being a part of it.

After a careful consideration of all the evidence we are of the opinion that the judgments, executions and levies resulted solely from steps taken by Mrs. Hanford and her brother at their own instance, uninfluenced and unaided by Mrs. Burgess or her business manager. The fact that Mrs. Hanford's husband learned of Mrs. Burgess' insolvency and of the necessity of immediate action for the collection of her note, from Prouty, is immaterial, since such information was obtained solely in response to inquiries which a diligent creditor is always at liberty to make of his debtor. Making the inquiry was a proper act of diligence by the creditor to secure her debt, and the fact that the question thus properly put was truly answered, did not make Mrs. Burgess or her business manager an actor in procuring the entry of the judgments. Prouty, in taking the notes from his private box and delivering them to the attorneys at the request of Mrs. Hanford and her brother, was acting for the owners of the notes and not for Mrs. Burgess. As there is no proof therefore of co-operation on the part of Mrs. Burgess or her agent in the entry of the judgments, and as there is no proof that she had determined to make the assignment until after she found her property in the hands of the sheriff, the case, in all its features is unlike that of *Preston* v. *Spaulding*, and fails to fall within the rule there laid down.

Some considerable stress is sought to be laid upon the circumstance that the same attorneys who entered up the judgments and caused the levies to be made, also drew up and superintended the execution of the assignment. This circumstance would doubtless have been quite material if the evidence had shown that these two matters were simultaneously presented to said attorneys for their advice and action. But such was not the case. When Mrs. Hanford and her brother ap-

plied to them to enter up the judgments, no question of an assignment is shown to have been raised, nor were said attorneys at that time, so far as appears, called upon to advise on that subject. So far as they knew, and so far as the evidence now shows, no assignment was then contemplated. It was not until the next day that Mrs. Burgess and her business manager called upon them and consulted with them as to the advisability of making the assignment. No collusion or co-operation is shown between Mrs. Hanford and her brother on the one hand and Mrs. Burgess and her business manager on the other, there being no evidence, or at least no satisfactory evidence, rebutting the *prima facie* presumption that these parties were acting each for himself and with no view to the accomplishment of a common purpose. The fact therefore that they employed and took the advice of the same attorneys does not seem to be material.

We are of the opinion that the Appellate Court erred in holding that said executions and levies constituted an illegal preference and in reversing the decree of the Circuit Court. The judgment of the Appellate Court will be reversed, and the decree of the Circuit Court will be affirmed.

*Judgment reversed.*