### International Trust Co. v. First National Bank.

1. VOLUNTARY ASSIGNMENTS—*Previous Dispositions of Property, When Valid.*—Before a debtor has entered upon a course of conduct looking to the surrender of all his estate, by means of an assignment for the benefit of his creditors, he may in good faith sell or mortgage any part thereof, confess judgments, or execute warrants of attorney to confess the same, and such transactions will be valid.

2. SAME—*Previous Disposition of Property, When to be Regarded as a Part of the Assignment.*—When a debtor has begun to make

arrangements for the transfer of all his estate for the benefit of his creditors, under the laws of this State, if he thereafter confesses a judgment in favor of one creditor, or gives him a judgment note for the purpose of enabling such creditor to acquire a lien or transfer a portion of his property to a creditor for the purpose of excepting the same from the operation of the contemplated assignment, such acts are regarded in law as a part of the assignment and scheme by which he surrenders his estate to his creditors.

3. PREFERENCES—*Judgments Confessed Shortly Before Making an Assignment.*—A judgment confessed shortly before the making of an assignment is not, nor is a transfer of property, or a payment of money to a creditor a short time before the making of the assignment, necessarily void.

4. SAME—*Burden of Proving Bad Faith.*—To render such a preference nugatory as against the assignee, the burden of proof is upon the one who assails such judgment, transfer or payment, to show that the same was made in contemplation of the assignment and for the purpose of giving a preference,

**Voluntary Assignment.**—Appeal from the County Court of Cook County; the Hon. ORRIN N. CARTER, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1901. Affirmed. Opinion filed April 18, 1902.

Appellant, the International Trust Company, is a banking and trust company, with offices in the city of Boston. John M. Graham, of Boston, is its president.

May 28, 1896, shortly after ten o'clock in the forenoon, appellant obtained judgment in the Circuit Court of Cook County, by confession, against the Northrup-Braslan-Goodwin Company, a Minnesota corporation, for the sum of $20,033.33, and at 10:52 o'clock of the same day an execution upon this judgment was delivered to the sheriff of Cook county, under which he levied upon and took possession of the personal property of the Northrup-Braslan-Goodwin Company in the city of Chicago.

Four judgments against the same party defendant were confessed and four executions issued May 28th. The executions were placed in the sheriff's hands in the following order: That upon appellant's judgment at 10:52 A. M., W. A. Foster, plaintiff's attorney; that in favor of the National Bank of Waterville, for $12,051.84, E. A. Irwin, attorney, at 10:53 A. M.; that in favor of Samuel W. Goodwin, for

$8,168.42, E. A. Irwin, attorney, at 10:54 A. M.; that in favor of Lake Manawa Land Company, for $860.61, E. N. Darrow, attorney, at 10:55 A. M.; that in favor of F. H. Howcroft, for $5,099.33, E. N. Darrow, attorney, at 10:56 A. M. Immediately thereafter, Mr. Darrow and a deputy sheriff got into a cab, went to the company's place of business in Chicago and the executions were levied in the order of the acceptance by the sheriff.

At 11 o'clock A. M. of the twenty-eighth day of May a deed of assignment, dated May 28, 1896, from the Northrup-Braslan-Goodwin Company to William Fenton, of Chicago, as assignee, was filed for record in the office of the recorder of deeds of Cook county. The twenty-ninth day of May, 1896, the County Court entered an order in the matter of this assignment, requiring the sheriff to turn over and surrender to the assignee the property levied upon under appellant's execution, and the executions of various other judgment creditors, without prejudice to the rights and liens of the execution creditors, which were reserved for the future determination of the court.

On the 22d of September, 1896, appellee, the First National Bank of Chicago, and other creditors of the company, filed their petition in the matter of said assignment, in which it was alleged that appellant's judgment and the judgments of the other judgment creditors, "were illegal and void as preferences made in contemplation of, and constructively as a part of the assignment in this cause," and that the warrants of attorney under which the judgments were confessed were unauthorized.

Appellant answered this petition, alleging that it was entitled to priority of payment and a preference over the petitioners, and denied, among other things, that its judgment was made in contemplation, or as constructively a part of the assignment in said cause. January 28, 1901, the County Court found that appellant's judgment was fraudulent and collusive, and constructively a part of the general assignment of the Northrup-Braslan-Goodwin Company, and decreed that the assets of said estate should

be distributed without reference to the lien of appellant's execution. From this judgment the present appeal is prosecuted.

The Northrup-Braslan-Goodwin Company was a corporation, of which Jesse E. Northrup, of Minneapolis, was president, William S. King, of Minneapolis, vice-president; Preston King of Minneapolis, secretary, Augustus H. Goodwin, of Chicago, treasurer, and Charles P. Braslan, of Chicago, general manager; these five officers constituting the board of directors.

In April, 1896, the company was financially embarrassed, and as a result, in April, 1896, Mr. Braslan went to Minneapolis, for the purpose of laying the matter before the Kings.

May 2d a meeting of the board of directors was called, at which Mr. Braslan, Mr. Goodwin and the Kings were present, Northrup being absent in New York in search of funds. At this meeting resolutions were adopted, authorizing any of the officers to execute a voluntary assignment, and to give judgment notes upon behalf of the company, in order to provide for any contingency which might arise through the inability of the company to meet its obligations. Mr. Braslan and Mr. Goodwin returned to Chicago after this meeting and endeavored to raise the money necessary for a re-organization of the company.

Mr. Braslan went to Boston and met Mr. Graham, the president of the International Trust Company, to which the Northrup-Braslan-Goodwin Company were then largely indebted. At that interview, Mr. Graham being told that the First National Bank of Chicago had the company's judgment note for $40,000, asked that a like note be given his bank; not being able to readily find a judgment note blank, a demand note was given by Mr. Braslan with the understanding that a judgment should be given if asked.

Mr. Graham testified :

" I then stated to Mr. Braslan that we had no regular attorney in Chicago and it might become necessary to send this demand note to an attorney at Chicago, and asked

him if he could suggest any reliable attorney who would look after our interests. He suggested the names of Mr. Darrow and Mr. Foster, and I inquired particularly about Mr. Darrow and he told me he was a young man, very bright and alert, and he thought he would be fully able to protect or look out for our interests. I asked if Mr. Darrow was counsel for the Northrup-Braslan-Goodwin Company, or for Mr. Braslan, and he said, 'No, he was not.' The matter was left in that way. He did give me the address of Mr. Darrow, and I think of Mr. Foster, but certainly of Mr. Darrow, at my request."

Mr. Graham sent the demand note to Mr. Darrow with instructions to obtain a judgment note if he thought best and " to take such course as will be best to secure our interests in case anything should occur rendering such action on your part necessary."

Mr. Darrow had been for some two years attorney of the Northrup-Braslan-Goodwin Company; whether he remained so up to the time of its assignment is in dispute.

On May 23d, after Mr. Braslan returned from his visit to Boston, a meeting of the board of directors was held in Minneapolis, at which Mr. Braslan, Mr. Goodwin, Mr. Northrup and the Kings were present. At that meeting the resolutions which had been passed at the meeting of May 2d were so amended as to authorize any two of the officers of the company to execute an assignment or judgment notes.

May 27th Mr. Braslan telegraphed to Mr. Northrup in Minneapolis to the effect that an assignment must be made on the following day. Upon receipt of this telegram, Mr. Northrup went to the office of the company's attorneys in Minneapolis and executed a deed of assignment to their attorney, Mr. Elbridge C. Cooke, with instructions that it should not be recorded until further orders, and immediately left for Chicago, on the evening of the 27th, for the purpose, if possible, of preventing the assignment there.

Mr. Northrup, after arriving in Chicago, became convinced that an assignment must be made and at once telegraphed to Minneapolis to that effect. The evening of May 27th an assignment was filed in Minneapolis.

Early in the morning of the 28th of May, the property of the Northrup-Braslan-Goodwin Company in Wisconsin, was attached by certain creditors of the company in Manitowoc, and the fact was known in Chicago prior to the confession of appellant's judgment, and before the deed of assignment was executed.

Mr. Braslan testified in this case as follows:

"Q.   Did Mr. Goodwin and yourself and Mr. Darrow discuss, prior to May 2, 1896, concerning to whom these judgment notes were to be given, provided the board of directors authorized their issuance ?   A.   Mr. Goodwin felt as though he ought to protect his family; I mean by that his brother and the National Bank of Waterville. His brother was S. W. Goodwin.   And I had talked, in the event of disaster, that I would like certain parties to be protected in the event of an assignment.   One was S. W. Goodwin; another the National Bank of Waterville; another the International Trust Company, of Boston; Howcroft & Watkins, of London.   I think that is all.   I don't remember a discussion in regard to the Lake Manawa Land Company.

Q.   Now, you state that it was discussed they were to be protected in the event of an assignment.   Will you state how they were to be protected ?   A.   By giving what you folks call a preference.

Q.   Did you call it a preference at that time, or did you call it a judgment note ?   A.   Judgment notes.

Q.   Now, do I understand from your testimony there that you desire to go on record as saying that arrangements had been made between Mr. Goodwin, Mr. Darrow and yourself that the preferred creditors or the five creditors in this case who have entered confessions of judgment were to be notified when they were to enter their judgments in order to secure a preference and get in ahead of the assignment ?   A.   As in my answer before, I stated that it was our purpose to care for those holding judgment notes.

(Mr. Foster :   I move to strike out the answer as expressing a conclusion rather than a statement of fact.)

A.   Well, it was my personal intention then so far as I went.   There were several talks on that subject between Mr. Darrow, Mr. Goodwin and myself.   E. N. Darrow, whom I have referred to, was an attorney of Chicago.   A month or two prior to our assignment he attended to more or less legal business for the Northrup-Braslan-Goodwin

Company. In fact, up to the time of the assignment he was the only one that received any cash consideration for legal services. Mr. Darrow, so far as I was personally concerned, had some differences of opinion as to the manner in which he cared for a case at Indianapolis, but he was there at our office even after that time up to the time of the failure. When I negotiated with him and sought his advice, I did not call upon him somewhere else. He was at our office most of the time. I do not know where his office was. I suppose he had an office, but I don't know where it was. He was at the office of our corporation a great deal of his time. He was there most every day, and sometimes several times a day, and remained a good portion of the business hours of the day, and his visits continued right up to the date of the assignment.

Q. What part did he take, if any, concerning the giving of these judgment notes, or what part he was to take under your instructions, if any? A. Well, what advice we got in the matter we got very largely from Mr. Darrow, of how to proceed in regard to the judgment notes and making the judgment notes. I never saw one until he made that out for the Northrup-Braslan-Goodwin Company. Mr. Darrow stated that it wouldn't appear right in the eyes of the court for him to represent so many of these judgment creditors, and he was going to retain the foreign party, Howcroft & Watkins, and the Lake Manawa Land Company, transferring the others to other attorneys. He had said to me at times that he would transfer one of them at least, to Mr. Foster. He stated to me, just prior to the failure, that Mr. Foster would represent the International Trust Company.

Mr. Apmadoc: Did Mr. Darrow state to you at any time who was to take charge of the National Bank of Waterville and the S. W. Goodwin judgment notes? A. Prior to the failure Mr. Darrow said he had introduced A. W. Goodwin to E. A. Irwin, who was to look after them. It was on the occasion of Mr. Goodwin's second visit here, which was about the last of May; somewhere around that. Sam Goodwin was here the day prior to our assignment. I think he was here two or three days before the failure, and a day or so afterward.

He also testified in part as follows:

Q. Will you state how came the International Trust Company to make the first levy—first I mean with reference to the other four confessions which were entered on

the morning of May 28th? A. It was understood and agreed by us, some days prior to the failure.

Q. Was that matter discussed at this interview to which you have referred as taking place at three o'clock on the day prior to the failure? A. There was no discussion of that sort on that day.

Q. It was prior to that? A. It was prior to that.

Q. Who was present at that discussion? A. It was understood between Mr. Darrow, Mr. Goodwin and myself— the rotation of preferences. I refer to Mr. A. H. Goodwin.

Q. You say it was understood. Did you instruct Mr. Darrow, or did Mr. Goodwin instruct Mr. Darrow in your presence, that such was to be the order? A. It was my wish that the International Trust Company should have the first preference. I expressed that to Mr. Darrow and to Mr. Goodwin.

Q. Was it settled at that discussion that the International Trust Company was to be first? A. Yes, sir.

Q. And as a result of your direction to Mr. Darrow or Mr. Goodwin's direction to Mr. Darrow? A. It was the result of my express wish that the International Trust Company would be the first preferred creditor.

Q. Was it arranged that these judgments were to be confessed before the assignment, or put on record? A. Yes, sir."

He further testified that Mr. Darrow told him the night before the assignment, that he was going to telegraph Mr. Graham to wire Mr. Foster, so it would reach Mr. Foster before ten o'clock next morning, transferring his attorneyship for appellant to Mr. Foster. He also testified that Mr. Darrow told him the day of the failure that two replies had been received.

W. A. FOSTER, attorney for appellant; ALBERT G. WELCH, of counsel.

PECKHAM, BROWN & PACKARD, attorneys for appellee.

MR. JUSTICE WATERMAN delivered the opinion of the court.

Before a debtor has entered upon a course of conduct looking to the surrender of all his estate by means of an assignment for the benefit of his creditors, he may in good faith, sell or mortgage any part thereof, confess judgments

and execute warrants of attorney to confess the same, and the transactions will be valid. But when he has begun to make arrangements for the transfer of all his estate to an assignee for the benefit of his creditors, under and by virtue of the assignment law of this State, if he thereafter confesses a judgment in favor of one creditor, or gives him a judgment note for the purpose of enabling such creditor to acquire a prior lien, or transfer a portion of his property to a creditor for the purpose of excepting the same from the operations of the contemplated assignments, such acts are treated and regarded as a part of the assignment and scheme by which he surrenders his estate to his creditors, and all preferences so by him given are treated as within the assignment and held void, as giving unlawful preferences; that is to say, as preferences, in and by the deed of assignment itself, are directly forbidden, the creditor may not do indirectly what the statute forbids his doing directly.

A judgment confessed shortly before the making of an assignment is not, nor is a transfer of property, or a payment of money to a creditor, a brief time before the making of an assignment, necessarily void.

To render the same nugatory, as against the assignee, the burden of proof is upon whomever may assail such judgment, transfer or payment, to show that the same was made in contemplation of the assignment and for the purpose of giving a preference. Preston v. Spaulding, 120 Ill. 208; Hide & Leather Bank v. Rehm, 126 Ill. 461; Hanford Oil Company v. First National Bank, 126 Ill. 584; Home National Bank v. Sanchez, 131 Ill. 330; Hanford v. Prouty, 133 Ill. 339.

Appellant insists that such proof has not been made in this case.

Appellant's contention in this regard is based largely upon its insistence that the testimony of Braslan and Goodwin, directors of the insolvent corporation, the Northrup-Braslin-Goodwin Company, upon citation to them issued, taken July 14th, 16th, 18th, 20th and 21st, 1896, is to be considered in this case.

The present proceeding was begun by petition filed September 22, 1896, two months after the taking of such testimony.

This is an independent suit in which pleadings were had, issues formed and evidence heard as in chancery.   Only evidence taken in this proceeding can be considered for the determination of the issues here involved.

Counsel for appellant seem, during the course of this cause, to have so considered, as they herein cross-examined Braslan as to what he had stated under the citation.   If all that he stated in July, when appearing in response to the citation, is admissible and to be considered here, such cross examination was idle; for there can be no reason for twice placing in this record evidence given under the citation.

The testimony of Braslan in this suit, if to be believed, is undoubtedly conclusive as to the intention of the insolvents to give to appellant and other creditors a preference by confession of judgments.

Is Braslan to be believed?   Is he in any way corroborated?   Is his testimony in harmony with or repugnant to that beyond dispute?

In all litigation it is proper to consider not only the evidence introduced, but that which, if existing, might have been given.

Braslan's testimony herein, is replete with narratives of things said by A. H. Goodwin, one of the insolvent's directors, and Darrow, its attorney, as to which of the creditors should be preferred and how this should be done.

According to Braslan, he, Goodwin and Darrow, frequently talked of these things.   If his testimony is in this regard false, why did not appellant place Goodwin and Darrow upon the witness stand?   If Darrow was not, up to the assignment, insolvent's attorney, daily advising it about the making of the assignment, and the giving of the preferences—if he did not state to Braslan that it "wouldn't appear right in the eyes of the court for him to represent so many of these judgment creditors and that Mr. Foster

would represent the International Trust Company," and if he did not, the night before the assignment, say that he was going to telegraph Mr. Graham to wire Mr. Foster, so that it would reach Mr. Foster before ten o'clock next morning, and if he did not tell Braslan that two replies had been received, why did not appellant refute this by its attorney, Mr. Darrow?

The president of appellant testifies that Mr. Darrow remained its attorney up to the 28th of May, 1896; and that he was never discharged; but the president declines to give contents of the communications between him and Darrow relative to the employment by appellant of Mr. Foster, and also declines to give its correspondence with Mr. Foster.

We do not regard the interview between the president of appellant and Mr. Braslan, at which the latter promised that upon appellant's request a judgment note should be given to it, as an arrangement for a preference. The subject of an assignment was considered as far back as the 13th of April; it probably was not fully decided upon by all the directors until the evening of May 27th, but for some time it had been definitely agreed by Braslan, Goodwin and Darrow that if an assignment were made, appellant and four other creditors should be preferred by confessions of judgment, and that appellant's judgment should stand first. This, Braslan testifies.

From appellant's contention that this is untrue, it must appear to it a strange coincidence that this is exactly what was done.

Most graciously, Darrow and Irwin, for the other judgment creditors, gave way, and appellant's execution was placed in the hands of the sheriff one minute before that of the National Bank of Waterville for $12,057.84; two minutes before that of Samuel W. Goodwin for $8,162.42; three minutes before that of the Lake Manawa Land Company for $860.61, and four minutes before that of F. H. Howcroft for $5,099.33; most strange of all, the deed of assignment was filed just four minutes after the last execution reached the sheriff's hands

Nearly all that is in this record is corroborative of Braslan's testimony.

We have examined the excerpts from the citation testimony of Braslan and Goodwin, contained in appellant's brief. Such excerpts show that under the citation Braslan did not testify fully; he said as little as he could as to the arrangements for preferences; he testified in this case freely as to this matter; there are inconsistencies between the two statements. The County Court and this, believe that which he has said in this suit; because it is borne out by substantially all else, and no attempt to contradict him by those who might, if he has not told the truth, was made.

The evidence does not merely show that appellant might have found out that an assignment was about to be made, and consequently had judgment entered up; it shows, clearly, that Darrow, appellant's attorney, not only knew when the assignment was to be made, but that he and insolvent's directors arranged for the preference to be given appellant and the manner in which this should be accomplished. This is not a case of a preference obtained by the diligence of a creditor without collusion with the insolvent.

Neither Darrow nor the president of appellant, nor any one, has appeared in this proceeding and testified that by diligence, and without collusion, was appellant's execution placed in the sheriff's hand before the assignment was recorded. The decree of the County Court is affirmed.