ROBERT G. HOFFMAN *et al.*

*v.*

ERNEST A. SCHOYER *et al.*

*Filed at Ottawa June 23, 1892.*

1. WAREHOUSE RECEIPTS — *validity as against assignee — failure to state marks or brands.* Section 24 of the act of 1871, relating to warehouse receipts, requires that "all warehouse receipts for property stored in public warehouses of class "C" shall distinctly state on their face the brands or distinguishing marks upon such property," but there is no provision in the act or in any other statute prescribing any consequences, penal or otherwise, for a failure to state on the face of the receipt such marks or brands. Therefore a warehouse receipt not showing on its face the brands or distinguishing marks of the property stored is not void as against an assignee for value.

2. SAME — *lien on property stored.* Where warehouse receipts fail to state on their face the brands or distinguishing marks upon the property for which they were given, so that such property can not be identified or distinguished from other similar property of the storer, and the property covered by the receipts is mingled in a common mass with such other property, and most, if not all, of the property covered by the receipts is removed from the warehouse and disposed of after the issue of the receipts, and other property is substituted in its place, the holders of such receipts will have a specific lien as against the party storing the property.

3. SAME — *acts of owner removing uncertainty as to property.* Although warehouse receipts, when issued, may fail to state on their face the brands or distinguishing marks, yet if, before any valid liens attach to the property stored, the party storing the same specifically sets apart and allots the merchandise in the warehouse to such receipts then in the hands of assignees for value, the uncertainty as to the goods called for by the receipts will, as against the storer and those seeking to assert his rights, be removed, and the lien of the receipts enforced as to the property thus identified and set apart, — and this, though the substitution and setting apart of the property may be done without the knowledge of the holders of the receipts. The right of such holders rests upon estoppel, and not upon contract.

4. SAME — *equitable lien of holder of receipt — how created — estoppel.* Where A & Co., the owners of many packages of tea and coffee stored in a public warehouse of the class C, after hypothecating some of their warehouse receipts to parties who advanced them money, fraudulently

withdrew the packages, by the consent of the warehouseman, without producing the receipts given therefor, and sold the contents, substituting other teas and coffees, in packages properly marked and designated, in place thereof, without the consent of the holders of the receipts: *Held,* that whether the warehouse receipts created a lien on the substituted property, of their own force, or not, A & Co., after substituting the property for that unlawfully and fraudulently withdrawn, and after making a specific allotment of it to the several outstanding receipts, were, on the plainest principles of equity, estopped to deny the equitable rights of the receipt holders, and that such holders might enforce an equitable lien upon the substituted property, and that such lien was not lost by the appointment of a receiver.

5. PARTNERSHIP—*right to marshal firm assets—applying them first to firm debts.* The equitable rule which requires the assets of a firm to be first applied to the payment of firm debts, is founded, not upon the equities of the creditors, but upon the equities of the partners; and the right of creditors who have secured no lien, to have the firm assets so marshaled as to satisfy their debts first, can only be worked out through the equities of the partners.

6. SAME—*right of firm—creditors' rights of subrogation.* Partnership creditors can become entitled to these equities only by virtue of a species of subrogation, which courts of equity, of insolvency or of bankruptcy will grant, when called upon to wind up the affairs of a partnership and distribute its assets, on equitable principles. But the right of subrogation only places the creditor in the shoes of the members of the firm. It does not enable the firm creditors to assert any equity which the members of the firm could not assert in their own behalf.

7. RECEIVER—*takes subject to all liens.* The rule is well settled that the appointment of a receiver, in a suit between partners for a dissolution and accounting, will not affect the claims of the creditors which have previously become liens. Such liens must be recognized and enforced to the same extent as though no receiver was appointed, and a simple contract creditor who, after judgment, files a creditor's bill, is in no better position than a receiver to resist the enforcement of such lien.

8. EVIDENCE—*stipulation for and against one not a party.* On a contest between holders of warehouse receipts and other creditors of an insolvent firm which had hypothecated the receipts, a stipulation of facts, expressly limited to the facts relating to receipts held by two of the parties, can not be used as evidence as against or in favor of other holders of receipts not parties to the stipulation.

9. CHANCERY—*of the answer as evidence.* While the admissions of an answer are evidence, and usually conclusive evidence, against the

defendant answering, of the truth of the facts admitted, yet mere allegations of an unsworn answer are not-evidence in favor of such defendant, but must be proved.

10. Same—*default admits the facts stated in bill.* Where a cross-bill is sufficient, on its face, to entitle the complainant therein to the relief sought, and the default of the defendants is taken, a decree dismissing the cross-bill as to such defendants is not proper, when the court does not require proof of the allegations of the bill.

11. Same—*of proof on default of defendant.* It is a matter of discretion with the court, even after default of the defendant, to require proof of the bill. And if the complainant, on being required by the court to furnish proofs of the allegations of his bill, fails to do so, it would seem that the court might dismiss the bill.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. Henry M. Shepard, Judge, presiding.

On the 7th day of February, 1888, Ernest A. Schoyer filed his bill in chancery, in the Superior Court of Cook county, against Ferdinand Hoffmeyer, alleging that the complainant and defendant had for several years been engaged as copartners in the business of buying and selling tea, coffee and other merchandise at wholesale, under the firm name of E. A. Schoyer & Co., said business having been carried on by them partly on their own account and partly as the agents of consignors and shippers; that during the last preceding year the firm had met with large losses, by reason of which its capital had become entirely exhausted, and the firm and both of its members had become insolvent; that the partnership should be dissolved and its assets applied equitably to the payment of its debts; that the outstanding accounts and bills receivable due to the firm aggregated the sum of $39,000, nearly all of which was for merchandise sold by the firm as agents or trustees and should be paid to the persons interested in the merchandise represented thereby; that the tangible property of the firm did not exceed $15,000 in value; that in addition, the firm was interested in merchandise, tea and

coffee stored in various warehouses, of the value of about $400,000, which was not under the control of the firm, the warehouse receipts for the same being held by various parties as security for debts due from the firm; that a receiver should be appointed forthwith to take possession of the assets of the firm, wind up its business, and apply its assets, or the proceeds thereof, as equity might require. The bill prayed for the appointment of a receiver, and that the partnership be dissolved and an accounting had of its business, and that the proceeds of its property be applied as should be directed by the court. On the day the bill was filed the defendant entered his appearance, and by agreement, Robert Y. Hebden was appointed receiver.

On the 10th day of February, 1888, on petition of the receiver, the allegations of which were admitted by both parties, an order was entered, reciting that it appeared to the court that said firm had a large amount of merchandise which was hypothecated and held in trust for various creditors, as security for advances and loans, and that the general creditors of the firm had no interest in said merchandise except in the surplus after paying the debts of the secured creditors, and that the secured creditors were willing to entrust its possession and sale to the receiver to sell on their account and at their expense, retaining the overplus for the benefit of the general creditors, and ordering and directing that said arrangement be made; that the receiver carry on the business of the firm for the purpose of liquidating its indebtedness, with authority to receive said property from said secured creditors, subject to their respective claims or liens, and to sell the same in the regular course of trade for the payment of their respective debts, and that, after paying the secured creditors, he bring the surplus into court for the general creditors.

On the 21st day of February, 1888, Robert G. Hoffman and others, composing the firm of Hoffman, Lee & Co., and John C. Lloyd and another, composing the firm of J. C. Lloyd & Co.,

the members of said firms being the present appellants, filed their petition alleging that they were general or unsecured creditors of E. A. Schoyer & Co.; that the liens claimed by the holders of said warehouse receipts were invalid, and praying to have the receiver directed to withhold payment of any money in his hands until the further order of the court and to have the goods stored in said warehouses disposed of by the receiver for the equal benefit of all the creditors of said firm.

An order was entered February 27, 1888, giving said petitioners leave to become parties defendant to said bill, and on the 1st day of March, 1888; they filed their answers making substantially the same allegations as in their said petition. They also at the same time filed their cross-bill, making the parties to the original bill, the First National Bank of Chicago, the Canadian Bank of Commerce, the Illinois Trust and Savings Bank, the American Exchange National Bank of Chicago, the American Exchange (limited) of Europe, the Bank of Montreal, the members of the firm of Beveridge, Rickords & Co., the Hong Kong Banking Corporation and the Yokohama Specie Bank, parties defendant. Defendant Schoyer answered said cross-bill, and general demurrers thereto by the Illinois Trust and Savings Bank, the First National Bank of Chicago, Beveridge, Rickords & Co., the American Exchange National Bank of Chicago and the Bank of Montreal were sustained.

On the 27th day of April, 1888, the appellants filed their original bill against the members of the firm of E. A. Schoyer & Co., alleging a recovery, on the 18th day of April, 1888, against said firm, by Hoffman, Lee & Co. of a judgment for $3629.40 damages and $7.50 costs, and by J. C. Lloyd & Co. for $3739.81 damages and $7.50 costs, and that executions on said judgments had been issued and returned wholly unsatisfied. Said bill also charged that E. A. Schoyer & Co. had debts due them, and money and choses in action either in their hands or in the hands of some one for them, and also had large quantities of goods stored in warehouses in Chicago or

elsewhere, the warehouse receipts for which had been pledged to divers persons or deposited by them under some agreement or contract, and the bill averred that in all of said property said firm had a valuable interest or equity which the complainants were unable to reach by execution at law, but which should be applied to the payment of their judgments. Said bill prayed for a receiver, for the conversion of said assets into money for the benefit of the complainants, and the application of the proceeds to their judgments. On motion, said bill was consolidated with the bill in this case, and the complainants therein were given leave to file an amended cross-bill.

On the 4th day of May, 1888, they filed their amended cross-bill alleging said indebtedness from E. A. Schoyer to them, the recovery of their judgments therefor, and the issuing and return of executions unsatisfied. Said cross-bill also alleges that, at the time of the filing of the original bill herein, said firm was indebted to divers other persons to the amount of about $570,000, and that the assets of the firm consisted of tea and coffee stored in warehouses in Chicago and elsewhere, of the value of about $400,000, and outstanding accounts for merchandise sold amounting to about $40,000, and that a decree had been entered in this cause adjudging said firm insolvent and dissolving the copartnership; that for several years prior to the appointment of the receiver herein, said firm had been engaged in the business of importing and dealing in tea and coffee, in Chicago and elsewhere, and in said business carried a large stock of merchandise, amounting to several hundred thousand dollars; that it was the custom of said firm to store said merchandise in public warehouses in the city of Chicago and elsewhere of "Class C," in which property is stored for hire, to be returned upon the return of the receipts issued therefor, and which receipts are required by law to distinctly state upon their face the brands or distinguishing marks upon such property; that at the time the receiver was appointed, the co-defendants of said firm to said cross-bill held

pretended warehouse receipts issued by said warehouses to said firm for tea and coffee which had theretofore been stored by them in the warehouses issuing said receipts, which receipts had been pledged by said firm to their said co-defendants as collateral security for debts owing to them respectively by said firm; that said pretended receipts were originally issued at different times to said firm for tea and coffee then stored by them in the warehouses issuing the same, such pretended receipts calling for a certain number of packages of tea or coffee, and that none of them stated or gave the brands or distinguishing marks upon the property therein referred to, as required by law, or contained any description whereby the property could be identified from the common mass into which it all was mingled; that all of said merchandise in fact bore or contained distinguishing marks or brands so that it might have been identified and described in any warehouse receipt issued therefor as required by law.

Said cross-bill further alleges that, after the delivery of said pretended receipts by said firm to their said co-defendants, and prior to the appointment of the receiver herein, said firm removed from said warehouses the goods for which said receipts had been given, without the return or cancellation of said receipts, and sold and disposed of the same in their business, so that at the time said receiver was appointed, the property for which said receipts were issued was not in the respective warehouses issuing the same, nor in the possession of said firm, but had been sold and disposed of by them, and had been delivered to the purchasers, without the surrender of said receipts to the warehousemen; that after the appointment of said receiver, said receipt-holders, in fraud of the rights of the other creditors of said firm, agreed among themselves upon a division of the goods of said firm then in warehouses, and induced the warehousemen who had issued said receipts, to deliver to said receipt-holders other goods of similar character to those called for by the receipts which had been stored by said

firm after the issue of said receipts, and upon which said receipt-holders had no lien or claim whatever; that thereby said receipt-holders fraudulently and without right became possessed of property belonging to the estate of said firm and to which the receipt-holders had no right, as against the other creditors of said firm or said receiver; that by said arrangement all the goods stored in said warehouses by said firm were seized by said receipt-holders, who are now seeking to have the proceeds thereof in the hands of the receiver applied to the payment of the debts secured by said receipts, in fraud of the rights of the other creditors of said firm.

Said cross-bill further alleges that said receiver is the managing officer of the Chicago branch of the Bank of Montreal, one of said receipt-holders, and as such is interested in prosecuting and enforcing its claim to said property obtained as aforesaid, and that all of the defendant banks are in substantially the same position with respect to said property, and that the complainants fear that said receiver will not institute and vigorously prosecute the measures necessary to protect the interests of the other creditors of said firm as against the Bank of Montreal and the other defendant banks, but will aid said banks in retaining said property and securing the proceeds thereof, in violation of the rights of the other creditors of said firm; that on the 10th day of February, 1888, an order was entered in this cause, on the petition of said receiver, recognizing the lien of said receipt-holders upon the property so seized by them, and authorizing the payment of their claims out of the proceeds of said property, to the prejudice of the rights of the complainants and the other general creditors of said firm.

Said amended cross-bill prays that said defendants account for the property so seized and taken possession of by them, and for the proceeds thereof, and pay and deliver the same to said receiver for the benefit of the creditors of said firm; that the rights of the parties in relation thereto be ascertained and

enforced; that the order of February 10, 1888, be vacated, and that the receiver be. required to hold the property and funds now in his hands for distribution under the order of the court, and contains a general prayer for relief.

The American Exchange National Bank of Chicago answered denying that it was the holder of any of said warehouse receipts, and disclaiming all interest in the subject-matter of the litigation. The Illinois Trust and Savings Bank, the First National Bank of Chicago, the. Bank of Montreal and the members of the firm of Beveridge, Rickords & Co. demurred to so much of said amended cross-bill as relates to the failure of said warehouse receipts to state or give the distinguishing marks or brands of the property therein referred to, and answered the residue of said cross-bill. By their answers, they each allege the loaning or advancing to the firm of E. A. Schoyer & Co. of various sums of money, taking and holding as security therefor warehouse receipts for tea and coffee stored by said firm in various warehouses. Said answers admit that after the delivery of said warehouse receipts by said firm to said defendants respectively, some, but not all, of the property represented by said receipts was sold and delivered to purchasers thereof by said firm, but aver that in every case where the property was so removed, other like property was, at the time of such removal, specially substituted and pledged in place of that so removed. Said answers deny that there was any agreement between said receipt holders or any of them for a division of the goods and merchandise of said firm in warehouses, or that they induced the warehousemen to deliver to them any merchandise which had not been before the appointment of the receiver specifically pledged to said defendants. Said demurrers were sustained, and to said answers general replications were filed.

Subsequently notice was given by publication to the American Exchange (limited) of Europe, the Hong Kong and Shanghai Banking Company and the Yokohama Specie Bank,

they being foreign corporations, and on the 22d day of October, 1888, their default was entered. On the 12th day of June, 1890, a hearing was had as to the other defendants on pleadings and proofs. At said hearing the complainants in the cross-bill read in evidence the receiver's petition on which the order of February 10, 1888, was entered, and also the receiver's report, from which it appeared that, in pursuance of said order he had sold on account of and at the expense of the secured creditors, all the merchandise claimed to have been covered by said warehouse receipts, realizing therefrom the sum of $300,591.68, and that all of said proceeds had been accounted for and paid over to said secured creditors, after deducting their share of storage, insurance and other incidental expenses. Said report also shows that the receiver, at the time of his appointment, found only a very small amount of assets belonging to the general creditors of said firm, the entire amount thus realized being only $5283, and that $100 of sample teas and a small amount of uncollected accounts were all the remaining visible assets of said firm. The complainants also called said receiver as a witness, and proved by him that at the time he was appointed receiver, he was the assistant manager of the Chicago branch of the Bank of Montreal, and also proved certain of his acts as receiver, and that, on paying over said moneys to the secured creditors, he had taken from them obligations to pay said moneys back to him in case this suit should result in a decree holding that they were not entitled thereto. It was also admitted by the defendants, for the purposes of this suit, that the complainants in the cross-bill were creditors of E. A. Schoyer & Co. as alleged in the cross-bill, and that after the filing of the original bill, but before the filing of their amended cross-bill, said complainants had recovered judgments for their said indebtedness and had executions issued thereon and returned unsatisfied as in their amended cross-bill alleged.

The foregoing was all the evidence adduced by the parties at the hearing, except two stipulations which were offered by said complainants, one signed by their solicitors and by the solicitors of the First National Bank of Chicago and of Beveridge, Rickords & Co., and the other signed by the solicitors of the complainants and of said First National Bank. The first of these stipulations is by its terms restricted to the facts relating to the claims of said First National Bank and of Beveridge, Rickords & Co. to certain tea and coffee in the Importers' Warehouse at the time of the appointment of the receiver, and the other is limited by its terms to certain additional facts in relation to the claim of said First National Bank to goods in said warehouse. The facts stated in the first of said stipulations, so far as they relate to controverted questions in the case, are as follows:

"At the time the bill was filed by Schoyer, and the receiver appointed, the First National Bank and Beveridge, Rickords & Co. held a large amount of warehouse receipts issued by the Importers' Warehouse of the city of Chicago, and purporting to cover certain tea and coffee stored in said warehouse by Schoyer & Co. Some of these receipts were delivered by Schoyer & Co., from time to time, to said First National Bank and Beveridge, Rickords & Co., as security for loans made at different times by them, respectively, to said firm, which receipts were so delivered at the time the loans were made. The remainder of such receipts so held by said First National Bank and Beveridge, Rickords & Co., had come into their possession, respectively, and were still held under the system of credits by which the teas and coffees represented thereby were bought and paid for as described in the answer of said bank and Beveridge, Rickords & Co. herein, each party (*i. e.,* said bank and Beveridge, Rickords & Co.,) so holding, under the receipts last aforesaid, only such teas and coffees as had been so bought and paid for under such party's own letter of credit. The warehouse issuing these receipts was a public warehouse of class "C."

The receipts were issued at different dates between August 4, 1887, and February 6, 1888.

"The receipts outstanding at the time of the failure were about twenty-five in number, and of these, six stated on their face the brands and marks on the tea and coffee called for by them, respectively. The other receipts contained no brands, numbers or other distinguishing marks by which the property could be identified from other property of like kind in the warehouse, nor was there any way by which the warehousemen or the receipt holders could identify the property applicable to any receipt. At the time these receipts were issued, and while they were outstanding, Schoyer & Co. had in this warehouse other tea and coffee for which no receipts were issued. These goods were not distinguishable or kept separate in any way from the other goods stored by them. The tea and coffee stored in the warehouse was of different varieties and of different grades and values, and the packages had on them marks, brands and numbers by which they could be distinguished. From these teas and coffees the warehousemen allowed Schoyer & Co. to withdraw packages indiscriminately, whenever they saw fit, so long as there were left on hand packages equivalent in number to those called for by the outstanding receipts. The surplus in the number of packages in the warehouse, over the number called for by the outstanding receipts, the firm used in its business, withdrawing packages for sale, storing other packages, and withdrawing again indiscriminately from the mass, without reference to when the goods were put in the warehouses, the warehouseman taking care, however, that the warehouse always contained the number of packages called for by the outstanding receipts. The warehouseman also, while these receipts were outstanding, allowed Schoyer & Co. to withdraw any of the goods on hand at any time, without reference to the receipts, upon their depositing an equal number of packages or returning a receipt for an equal number.

In this way the property in the warehouse was constantly changing, and at the time the receiver was appointed a large part of the tea and coffee which was in the warehouse when the receipts were issued had been withdrawn and sold by Schoyer & Co., though the warehouse contained a sufficient number of packages of tea and coffee to answer the receipts. These withdrawals of goods by Schoyer & Co., and changes in the property, were made entirely without the knowledge or consent of the receipt holders, and they had no notice of them until after the receiver was appointed.

"Shortly before the appointment of the receiver, Schoyer & Co., in view of their approaching failure, from their books made a list of goods then in the warehouse, designating them by their marks, brands and numbers, and in these lists apportioned the goods among the holders of the receipts, designating which were to go to the First National Bank and which to Beveridge, Rickords & Co., partly arbitrarily and partly by determining, as far as possible, which of the packages in the warehouse were originally pledged to the respective receipt holders, which had been substituted in the place of such original packages, and which had been imported under the system of credits aforesaid of the respective receipt holders. Of this act on the part of Schoyer & Co., neither of these receipt holders had any knowledge until after the appointment of the receiver, when a copy of the list so made by Schoyer & Co. was given each of them. They then delivered their receipts and their lists to the receiver for sale, without prejudice to the rights of any of the parties hereto. The receiver then surrendered these receipts to the warehouseman, who thereupon issued to him, in his name as receiver, new receipts, bearing on their face the brands, marks and numbers on the goods in the warehouse, substantially as shown by the lists made out by Schoyer & Co., as above set forth. The goods were sold by the receiver after the filing of the original cross-bill herein, and the proceeds paid over by him to these defend-

ants, they giving him an agreement to repay if held liable in this proceeding."

The second of said stipulations was as follows:

"The following is a true statement of additional facts to those set forth in the stipulation herein, relating to the goods in the Importers' Warehouse, and these facts are to be considered as a part of that stipulation, so far as they affect the rights and liabilities of the complainants and the First National Bank of Chicago herein. Certain other of the warehouse receipts held by said First National Bank at the time of the appointment of a receiver herein had been issued by the Central Warehouse, a public warehouse of class "C," and were held by said bank either as collateral security for loans made to Schoyer & Co., or under the system of credits set up in its answer herein. A part of these receipts originally contained no brands, numbers or other distinguishing marks by which the property represented or supposed to be represented by them could be distinguished or identified from other goods which had been placed in said warehouse by said Schoyer & Co. The receipts so held by said First National Bank did not cover all the goods placed in said warehouse by said Schoyer & Co. After the appointment of the receiver herein, the agent of said First National Bank presented the receipts which had no distinguishing marks, as above stated, to said warehouse, and drew the warehouseman's attention to the omission, and asked if he could supply the same. The warehouseman answered that he could, and thereupon, at the request of the agent of the bank, he then and there did insert in the receipts distinguishing marks which he said identified the property correctly, and with these marks so inserted, the property by them indicated was afterward withdrawn, as hereinafter stated. The receipts, after marks had been so inserted in some of them, were delivered by said bank to the receiver herein, the property withdrawn and sold by him, and the proceeds paid over to said bank, in the manner set forth in the stipulation

above mentioned. The method of business between the firm of Schoyer & Co. and the Central Warehouse, was the same as that pursued with the Importers' Warehouse, as set forth in said stipulation, and the brands and marks inserted in certain of the receipts, as aforesaid, conformed to and agreed with a list made by Schoyer & Co. shortly before their failure, for the purpose of apportioning the goods among the receipt holders, like to the list described in said stipulation as made in the case of the Importers' Warehouse."

The court, at said hearing, found that the equities of the case were with said defendants to the cross-bill, and entered a decree dismissing said cross-bill, and also the original bill filed by said cross-complainants at their costs for want of equity. Said decree has been affirmed by the Appellate Court on appeal, and by a further appeal the record is now brought to this court for review.

Messrs. TENNEY, CHURCH & COFFEEN, for the appellants:

The warehouse receipts gave the holders no claim upon the goods in the warehouse separated or identified, or capable of identification, and because the receipts were issued in violation of law. *Wood* v. *McGee,* 7 Ohio, 466; *Golden* v. *Ogden,* 15 Pa. St. 528; *Hutchinson* v. *Hunter,* 7 id. 140; *Haldeman* v. *Duncan,* 51 id. 66; *Horr* v. *Barker,* 8 Cal. 603; *McLaughlin* v. *Piatte,* 27 id. 451; *Courtwright* v. *Leonard,* 11 Iowa, 32; *Cook* v. *Fagan,* 7 id. 142; *Murphy* v. *State,* 1 Ind. 366; *Scott* v. *King,* 12 id. 203; *Lacy* v. *Weaver,* 49 Ill. 393; *Ferguson* v. *North Bank,* 14 Bush. 555; *Lester* v. *East,* 49 Ill. 588; *Bank* v. *Gillette,* 90 Ind. 268; *Moss* v. *Meshew,* 8 Bush, 187; *May* v. *Hoagland,* 9 id. 174; *Newcomb* v. *Cabell,* 10 id. 460; *Reeder* v. *Machen,* 57 Md. 56; *Fishback* v. *VanDusen,* 3 Minn. 111; *Galloway* v. *Weeks,* 54 Wis. 604; *Ackington* v. *Richey,* 41 Ill. 275; *Keeler* v. *Goodwin,* 111 Mass. 490.

That a pledge of an unseparated part from a mass is incomplete, and confers on the pledgee no right to the goods, is stated

in Jones on Pledges, section 26, where it is also stated that a mere agreement of parties is not equivalent to actual or symbolical delivery. (See, also, *Casey* v. *Cavaroc*, 96 U. S. 467.) The rule is also recognized in the following English cases. *Wallace* v. *Breeds*, 13 East, 522; *Austin* v. *Craven*, 4 Taunt. 644; *White* v. *Shuttleworth*, 5 id. 176; *Rusk* v. *Davis*, 2 M. & S. 397; *Campbell* v. *Mersey*, D. & H. B. 14 C. B. 412; *Acraman* v. *Morrell*, 65 E. C. L. 449; *Aldridge* v. *Johnson*, Langdell's Select Cases, 859.

Mr. ORVILLE PECKHAM, for the appellee the First National Bank, and Mr. H. H. C. MILLER, for Beveridge, Rickords & Co. :

Appellants are mere general creditors, without lien of any kind, and are in no better standing before the court than Schoyer & Co.    *Boute* v. *Cooper*, 90 Ill. 440; *Shaw* v. *Glenn*, 37 N. J. Eq. 32; *Hansett* v. *Harrison*, 105 U. S. 401; *Stuart* v. *Platt*, 101 id. 731; *Von Hensen* v *Radcliff*, 17 N. Y. 580.

On the question of identity of the goods embraced in the receipts, see *Stonard* v. *Dunkin*, 2 Camp. 344; *Gillette* v. *Hill*, 2 Cr. & M. 530; *Ryder* v. *Hathaway*, 21 Pick. 298; *Knights* v. *Niffen*, L. R. 5 Q. B. 660.

Messrs. LYMAN & JACKSON, for the appellee the Bank of Montreal.

Messrs. PRUSSING, HUTCHINS & GOODRICH, for the appellee the Illinois Trust and Savings Bank.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

We are of the opinion that the decree, so far as it relates to the claim of the First National Bank of Chicago and of Beveridge, Rickords & Co., is correct. No question is made that when the warehouse receipts held by these parties were issued, E. A. Schoyer & Co. had in store in the warehouses issuing them the packages of tea and coffee therein mentioned, nor

that said receipts were duly assigned to said parties by E. A. Schoyer & Co. as security for loans of money made in good faith by the former to the latter. It is admitted that while E. A. Schoyer & Co. were permitted by the proprietors of the warehouse to withdraw, from time to time, portions of the merchandise covered by said receipts, upon depositing other like merchandise in its place so as to keep constantly on hand the number of packages called for by the receipts, the fact of such withdrawal was not known to the holders of said receipts. They had a right to suppose, and doubtless did suppose, that the property thus pledged to them remained in the warehouse, subject to their order at any time on surrender of said receipts.

It can not be doubted that the acts of both the warehouse-man and of E. A. Schoyer & Co., in thus disposing of portions of the property for which the warehouse receipts were given, were plain violations of the statute as well as frauds upon the receipt holders, and we are inclined to the opinion that, in consequence of such fraud, said receipt holders, as against E. A. Schoyer & Co., were entitled to at least an equitable lien upon the merchandise deposited in lieu of, and thus sought to be substituted for, that taken away and disposed of. On this subject we need only refer to what we said in *Union Trust Co.* v. *Trumbull*, 137 Ill. 146.

But the equities of the First National Bank and of Beveridge, Rickords & Co. rest upon a more specific appropriation by E. A. Schoyer & Co. to the satisfaction of said warehouse receipts of the merchandise in said warehouse. It is admitted that, shortly before their failure, E. A. Schoyer & Co., in view of their approaching failure, made out a list of the merchandise then in the warehouse, designating the same by marks, brands and numbers, and in such lists specifically apportioned said merchandise among the holders of said receipts, designating which were to go to the First National Bank and which to Beveridge, Rickords & Co. The mode in which such appor-

tionment was made was by ascertaining, so far as possible, the packages still remaining in the warehouse which were originally pledged to the respective receipt holders, and also those which had been substituted in place of the original packages which had been withdrawn, thus seeking by express appropriation to give effect to the receipts as creating liens upon both.

There can be no doubt that, under these facts, the receipt holders became entitled, as against E. A. Schoyer & Co., to an equitable lien on said merchandise, such lien arising, if on no other ground, at least upon the ground of estoppel. *Union Trust Co.* v. *Trumbull, supra.* Whether the warehouse receipts created a lien on the substituted property of their own force or not, E. A. Schoyer & Co., after substituting it for that unlawfully and fraudulently withdrawn, and after making a specific allotment of it to the several outstanding receipts, were, on the plainest principles of equity, estopped to deny the equitable rights of the receipt holders. If after said allotment and before the appointment of the receiver, said receipt holders had instituted proper proceedings for the assertion of their lien, they would clearly have been entitled to have it enforced.

The rule is well settled that the appointment of a receiver in a suit between partners for a dissolution and accounting will not affect the claims of creditors which have previously become liens. High on Receivers, sec. 495; Beach on Receivers, sec. 576. Such liens must be recognized and enforced to the same extent as though no receiver had been appointed. Nor are the appellants in any better position to resist the enforcement of the appellee's lien than were E. A. Schoyer & Co. before the appointment of the receiver. They were simple contract creditors, and as such, had no lien on the firm assets of their debtors. The equitable rule which requires the assets of a firm to be first applied to the payment of firm debts, is founded, not upon the equities of the creditors, but upon the equities of the partners, and the right of creditors who have

secured no lien to have the firm assets so marshaled as to satisfy their debts first, can only be worked out through the equities of the partners. *Hanford* v. *Prouty*, 133 Ill. 339; 1 Bates on Partnership, sec. 560 *et seq.* Partnership creditors can become entitled to the benefit of these equities only by virtue of a species of subrogation, which courts of equity, of insolvency or of bankruptcy will grant, when called upon to wind up the affairs of a partnership and distribute its assets on equitable principles. Bates on Part. 825. The utmost then which the appellants are entitled to claim through the receiver is to be subrogated to the equitable right of the members of the firm of E. A. Schoyer & Co. to have the firm assets first applied to the payment of the firm debts. But the right of subrogation only places the appellants in the shoes of the members of said firm, and enables them to assert no equity which said members could not have asserted themselves. As therefore the members of the firm of E. A. Schoyer & Co. were estopped to deny the appellees' right to their lien, the appellants for the same reason and to the same extent are also estopped.

But it is objected that because the warehouse receipts held by the First National Bank and by Beveridge, Rickords & Co., or at least the greater part of them, failed to state on their face the brands or distinguishing marks upon the property therein mentioned, as required by section 24 of the act of April 25, 1871, they were issued in violation of law and are therefore void. Said section 24 provides that: "All warehouse receipts for property stored in public warehouses of class C shall distinctly state on their face the brands or distinguishing marks upon such property." There is no provision, however, in said act, or in any other statute, so far as we are aware, prescribing any consequences, penal or otherwise, for a failure to state on the face of a receipt, the distinguishing marks or brands upon the property.

Section 25 of said act makes it a felony, punishable by imprisonment in the penitentiary, for any warehouseman of any public warehouse, to issue any warehouse receipt for any property not actually in store at the time of issuing the same, or to issue any warehouse receipt fraudulent in its character, either as to its date, or the quantity, quality or inspected grade of such property, or to remove any property from store (except to preserve it from fire or other sudden danger,) without the return and cancellation of any and all outstanding receipts that may have been issued to represent such property. Similar provisions against issuing fraudulent warehouse receipts, and against fraudulent removals of property for which warehouse receipts have been given, are found in sections 125 and 126 of the Criminal Code. But there is no statute imposing any penalty for issuing warehouse receipts for property stored in warehouses of Class C which do not state on their face the brands or distinguishing marks on said property, nor is there any statute declaring receipts thus issued to be in any respect invalid. Under these circumstances we should be reluctant to hold a receipt of that character to be void as against an assignee for value.

But it is further urged that, as said receipts stated no brand or distinguishing mark on said property, the lien asserted must fail because of the impossibility of distinguishing or separating the property covered by said receipts respectively from the general mass of similar merchandise with which it was mingled. If the question were one arising between an execution or attachment creditor and the receipt holders the question might perhaps be an embarrassing one. But here it is to be viewed precisely as though the issue were made between the receipt holders and the members of the firm of E. A. Schoyer & Co. As the appellants are seeking, through the receiver, to be subrogated to the equities of the members of said firm, the question is to be viewed in the same light that it would if it were being litigated by them. Whatever uncertainty there

may have been as to the identity of the property upon which the lien of the receipt holders rested before E. A. Schoyer & Co. specifically set apart and allotted the merchandise in the warehouse to these receipts, it must be held, as against the members of said firm and as against the appellants who litigate in their right, that such appropriation and allotment put an end to all uncertainty on that subject, and that the property to which the lien of the receipts must, as between the present parties, be held to apply, thereby became separated from the mass and precisely identified.

The point is also made and strenuously insisted upon, that the specific appropriation and allotment by E. A. Schoyer & Co. of property in the warehouse to the several warehouse receipts held by the First National Bank and Beveridge, Rickords & Co., though made prior to the appointment of the receiver, was not communicated to or accepted by said receipt holders until afterwards, and that such allotment was incomplete and therefore ineffectual at the time the receiver was appointed and the rights of the general creditors of said firm became fixed. If the rights of said receipt holders rested solely upon contract, this contention apparently would not be without force. Contracts can be formed and contract rights acquired only by the assent of both the contracting parties. But here the right of the receipt holders to the substituted property rests, not upon contract involving acceptance and mutual assent but upon estoppel. Portions of the property covered by the receipts having been unlawfully and fraudulently disposed of by E. A. Schoyer & Co. and like property substituted and specifically appropriated by them in its place, they are estopped to deny that such substitution and appropriation was consummated and effectual, even though it was done without the knowledge or assent of the receipt holders.

But we are of the opinion that the decree, so far as it relates to the rights of the other receipt holders is not sustained by the evidence. The stipulations as to the facts are expressly

limited to such facts as relate to the warehouse receipts held by the First National Bank and Beveridge, Rickords & Co., and have no application to the receipts held by the Bank of Montreal, the Illinois Trust and Savings Bank, or the foreign banking corporations whose default was entered. As to those receipts, the case rests mainly if not entirely upon the allegations and admissions made by the pleadings. .The amended cross-bill, so far as it relates to the rights of the defendants here referred to, alleges, in substance, that the warehouse receipts held by them, failed to state upon their face the brands or distinguishing marks upon the property for which they were given whereby. said property could be identified or distinguished from other similar property of E. A. Schoyer & Co. in the same warehouses, and that the property covered by the receipts was mingled in a common mass with such other property, and was therefore incapable of identification; also that most if not all of the property covered by said receipts was removed from said warehouses and disposed of by E. A. Schoyer & Co. after the receipts were issued.

The Bank of Montreal and the Illinois Trust and Savings Bank, by their demurrer to so much of the amended cross-bill as relates to the form of said warehouse receipts, admitted that said receipts failed to state on their face the brands or distinguishing marks upon the property. By their answers to the residue of said cross-bills, they admit that portions of the property covered by the receipts were removed from the warehouses and disposed of by E. A. Schoyer & Co. after the receipts therefor were issued. The result arising from these admissions, taken by themselves, would seem to be, first that as the receipts were originally issued, the property intended to be included therein was not so described as to be capable of identification, and that the receipts therefore failed to create any specific lien in favor of the receipt holders, and, second, that so far as said property was removed and disposed of, any lien that might otherwise be claimed by virtue of the receipts

was destroyed and lost. To obviate and repel this result, however, said answers alleged that, in every instance, where property was removed and disposed of, other like property was deposited in the warehouse and substituted for that removed. But of the truth of this allegation the record furnishes no proof. The stipulation as to the facts entered into on behalf of the First National Bank and Beveridge, Rickords & Co. can not be resorted to as furnishing such proof, as the other defendants were not parties to such stipulations, and said stipulations related to a wholly different subject matter, viz., the property covered by the receipts held by the First National Bank and Beveridge, Rickords & Co. While the admissions of an answer are evidence and usually conclusive evidence against the defendant answering of the truth of the facts admitted, mere allegations of an unsworn answer are not evidence in favor of such defendant. To make out the defense thus set up if it is to be regarded as a sufficient defense, evidence should have been introduced supporting said allegations, and this was not done.

The only evidence on this point to which we are referred is that furnished by the statements of the petition filed by the receiver asking for authority to receive from the secured creditors the merchandise covered by said receipts, and to carry on the business of the firm for purposes of liquidation. In said petition, which was introduced in evidence by the complainants in the cross-bill, it is stated, in substance, that almost the entire amount of the personal property in which E. A. Schoyer & Co. had any interest was held by various banks as collateral security for loans or drafts against the same, and that the Illinois Trust and Savings Bank held 3905 packages of tea and coffee, and the Bank of Montreal 7562 packages.

Doubtless said petition was properly admitted in evidence as showing one of the steps which had been taken in the case which the plaintiffs in the cross-bill were seeking to have

modified, viz, the order of February 10, 1888, directing the receiver to pay over the proceeds of the merchandise claimed under said warehouse receipts to the receipt holders. But it is, to say the least, doubtful whether the complainants, by offering it in evidence, became bound by it as tending to prove the truth of the various statements therein contained. But however that may be, said statements come far short of proving the allegations of the answer. Said statements are merely that, at the date of the petition, these two banks held certain numbers of packages of merchandise as security for loans, but furnish no evidence as to the validity of the title under which said merchandise was so held, that being the question raised by the pleadings.

Nor do we think the decree sustainable as against the foreign corporations whose default was entered. By the default the averments of the amended cross-bill were taken *pro confesso* as against the defendants defaulted, and said cross-bill being sufficient on its face to sustain the contention of the complainants therein and to entitle them to the relief thereby prayed for, a decree dismissing the bill for want of equity should not have been entered in favor of the defendants who by their default had confessed the bill. True, it is a matter of discretion with the court, even after default, to require proof of the averments of the bill, and we are not prepared to say that if the complainants, on being required by the court to furnish proofs of the allegations of their bill had failed to do so, their bill might not properly have been dismissed for want of such proofs. But it does not appear that any such requirement was made in this case, or that the bill was dismissed as to the defendants defaulted on that ground.

The decree, so far as it relates to the First National Bank and to Beveridge, Rickords & Co., will be affirmed, but so far as it relates to the other defendants it will be reversed and the cause will be remanded for further proceedings not inconsistent with this opinion, leave being given to the parties to

introduce further evidence, and leave also being given to the defendants whose default has been entered to apply to have their defaults set aside and for leave to answer.

*Decree affirmed in part and in part reversed.*

Subsequently, at the March term, 1892, upon a rehearing, the court filed this further opinion:

Per Curiam: Having again considered the questions discussed in this case on a rehearing, we have arrived at the conclusion that our former views, as indicated by the opinion filed, are, substantially, correct and we therefore now refile that opinion as the opinion of the court and affirm the judgment in part and reverse it in part as therein indicated.